UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 13-80153-CR-RYSKAMP/HOPKINS

UNITED STATES OF AMERICA

    Plaintiff

vs.

TIMOTHY MCCABE

    Defendant

_____/

**DEFENDANT'S RESPONSE AND OBJECTIONS TO HIS
PRESENTENCE INVESTIGATION REPORT**

**I - OVERVIEW**

    By 2013, Mr. McCabe lost everything, including the courage to be honest and forthright. Mr. McCabe lacked the conviction to do the right thing. Instead, Mr. McCabe fled, removing himself from the practice of law, his family and the local community he supported and then defrauded. Mr. McCabe left goodbye notes to his friends and family, parked his car at the Palm Beach International Airport garage, lived in Hostiles, traveled by bus across the country, meandered in towns to remain unseen, and returned to the Southern District of Florida to voluntarily surrender on June 20, 2013.

Since June 20, 2013, Mr. McCabe has been contrite.

Mr. McCabe takes full responsibility for his actions and crimes.

Mr. McCabe has no prior criminal arrests and/or convictions anytime, anywhere.

Mr. McCabe self-surrendered one day after the warrant for his arrest was issued.

Mr. McCabe has been sincere, honest and straight-forward since his self-surrender.

Mr. McCabe has been cooperative with the Authorities since his self-surrender. Mr. McCabe wants to pay restitution.

Timothy McCabe, or as he's known to his friends, Tim, is a 55 year old married father of three daughters ranging in ages from 9 to 15 years old. Tim hails from New Jersey, the only child born to Robert and Theresa McCabe. He was raised in a middle class environment with no abusive issues within the family setting. He married his first and only wife, Donna Zogby, in 1993. Mr. McCabe graduated from Holy Cross College in Massachusetts in 1980, with a Bachelor of Arts Degree, then attended and graduated from Rutgers University in New Jersey in 1983 with a Juris Doctorate Degree. Mr. McCabe was admitted into the Florida Bar in 1990, and moved to Boca Raton, Florida in 1994, where he continued practicing law until his voluntary disbarment in 2014.

Mr. McCabe's parents had resided in Florida for the past 23 years. In 2012, Tim's mother passed away due to a head injury sustained after she fell in a hospital waiting treatment for other maladies. Mr. McCabe's 81 year old father resides in Greenacres, Florida and is disabled with a myriad of issues. Mr. McCabe's wife is the father's primary caregiver. She cares for him as he is wheelchair bound. Sadly (but all too often seen in the criminal courts), Mr. McCabe's crimes have directly affected his own family. Mr. McCabe's criminal conduct has placed a great burden on his wife, who is self-employed, cares for her three daughters and ill father-in-law.

Mr. McCabe has had several medical issues, including removing the lower left lobe of his lung which had several tumors and a cyst. This lung condition makes Mr.

McCabe prone to pneumonia and bronchitis. He has had several pre-cancerous growths removed from his head, has high cholesterol, and high blood pressure. Although presently (and understandably) under stress waiting this Court's sentencing decision, Mr. McCabe has no history of mental or emotional problems. However, in and around 2008, due to a plethora of financial issues, Mr. McCabe began to drink heavily, up to one bottle of vodka daily, as well as abuse amphetamines. This was confirmed by his wife, and continued until the culmination of the offenses. It is requested the Court recommend Mr. McCabe participate in the Bureau of Prisons 500 hour Residential Drug Abuse Program (RDAP).

Mr. McCabe currently has no viable assets/funds, and his wife and kids are being supported with the assistance of relatives. Mr. McCabe will be ordered to pay restitution, and based on his financial condition, a fine is not recommended.

Mr. McCabe was a self-employed attorney in Palm Beach County, Florida for 23 years until his self-surrender on June 20, 2013. As an attorney, he worked through three entities, Timothy McCabe, PA; McCabe and Samijan, LLC; and City Title, LLC, all primarily focused on real estate transactions. The businesses did well financially, at one point their combined earnings were over $120,000 per month. Mr. McCabe supported the businesses, paid 18 employees, and earned a profit. When the real estate market crashed in 2008-2009, Mr. McCabe's life savings were invested in the firms, the Title Company and various commercial real estate entities. In less than six months, properties previously worth $6,000,000 were worth less than half. Over the next three

years, these same properties were worth only $1,000,000. Contemporaneously, the law firm and title company income evaporated, from the $120,000 per month to $10,000 per month. Mr. McCabe, every month, covered a short-fall of $50,000, including employee salaries. There was no more cash flow. Mr. McCabe first used his personal funds to cover these expenses. Only after Mr. McCabe exhausted all his personal savings did he take monies from his Attorney Trust Account. These monies were diverted to pay employee salaries, health insurance, and investments in new business creations; all in an effort to cover monthly losses. As Mr. McCabe received money from fictitious real estate investments, the money was used to reimburse the Attorney Trust Account. Eventually, Mr. McCabe needed additional money to cover both the Attorney Trust Account short-fall and investor principal returns. Some investors, in lieu of return on principal, demanded and received an increase in their monthly interest payments. Investors who previously received 3% interest per month (36% annually) demanded and received up to 10% interest per month (120% annually). Mr. McCabe could not sustain these payments. In 2013, Mr. McCabe was making investor interest payments totaling approximately $250,000. In early 2013, Mr. McCabe realized there was no way out – other than to keep withdrawing monies from his Attorney Trust Account and continuing to generate new investor money. Finally, Mr. McCabe stopped the cycle. In April 2013, Mr. McCabe left his family and law practice. He genuinely believed that if he stayed home, his wife, children and business partners would be subject to overwhelming scrutiny because of their association with him.

## II - INTRODUCTION

COMES NOW, TIMOTHY MCCABE, through his attorney, Robert S. Gershman, pursuant to Rule 32 (f) of the Federal Rules of Criminal Procedure, and Rule 88.8 of the Local Rules for the Southern District of Florida, and respectfully files this Response and Objections to his Presentence Investigation Report. Mr. McCabe moves for the imposition of a reasonable sentence not greater than necessary to meet the sentencing concerns expressed by Congress in 18 U.S.C. §3553 of the United States Code. Mr. McCabe and counsel have reviewed the PSI.

Pursuant to U.S. v. Booker, 543 U.S. 220 (2005), the federal sentencing process has adopted a three step approach. (See Fed. R. Crim. P. 11(M) amended December 1, 2007). First, the Court is to resolve any disputed guideline issues and determine the advisory guideline range. Second, the Court is to consider if there are any factors that may warrant a departure from the advisory guideline range. As before Booker, the Court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered," U.S. v. Jordi, 418 F. 3d 1212, 1215 (11th Cir. 2005). Lastly, the Court is to consider all of the sentencing factors of 18USC§3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18USC§3553(a). Mr. McCabe offers a compelling argument for this Court to consider amending the present guideline application and impose a sentence below the applicable sentencing guideline range.

## III - REQUEST FOR A REASONABLE SENTENCE

"Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated-like commodities, and the attempt to do so can only lead to bizarre results." United States v. Gupta, 2012 U.S. Dist. LEXIS 154226, at *1-2 (S.D.N.Y. Oct. 24, 2012).

The Guidelines developed by the United States Sentencing Commission are to be used as a starting point only. Gall v. United States, 552 U.S. 38, 50, 128 S. Ct. 586 (2007). The Supreme Court has specifically held that reasonable policy disagreements with the sentencing guidelines are an appropriate basis for determining a sentence outside of the guideline range. Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558, 570 (2007).

Gall v. United States, supra, sets the standard for Federal Courts to follow in calculating a reasonable sentence:

> A District Court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the 3553(a) factors to determine whether they support the sentence requested by a

> party. In so doing, [s]he may not presume that the Guidelines range is reasonable. [S]he must make an individualized assessment based on the facts presented.

552 U.S. 38, 128 S. Ct. 586, 596-97 (2007).

Mr. McCabe respectfully suggests that, based on the facts and circumstances of his case, and in light of the factors enumerated in 18 U.S.C. §3553(a), the appropriate sentence is one below the advisory Guideline range. 18 U.S.C. §3553(a) directs the Court to impose "a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Section 3553(a)(2) provides that this Court shall fashion a sentence which:

> (A) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense;
>
> (B) provides adequate deterrence to criminal conduct;
>
> (C) protects the public from future crimes of the defendant; and
>
> (D) provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).

As this Court well knows, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009) (emphasis in original), Covington v. United States, 556 U.S. 1123 (2009), and Bain v. United States, 556 U.S. 1218 (2009). The Supreme Court has now made it clear that a District Court's exclusive reliance on a Sentencing Guidelines calculation is erroneous, and that a lawful sentence may not be imposed on the assumption by the

District Court that the Sentencing Guidelines calculation is reasonable. It must, instead, be based on the statutory criteria in Section 3553(a), and the Court must explain what weight is being given to the statutory criteria at the time the sentence is imposed.

The Supreme Court unequivocally stated in <u>Nelson</u>, that "cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." <u>Nelson</u>, 555 U.S. at 35. "[T]he numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice." <u>Gupta</u>, 2012 U.S. Dist. LEXIS at *4. Accordingly, the Guidelines are but one, and only one, of the factors to be considered by the District Court who must, after considering all the sentencing factors, "tailor the sentence in light of other statutory concerns." <u>United States v. Ellis</u>, 419 F.3d 1189, 1193 (11th Cir. 2005). The Eleventh Circuit has refused to adopt a rule that a sentence at the low end of a properly calculated advisory sentencing guideline range is per se reasonable. <u>United States v. Talley</u>, 431 F.3d 784 (11th Cir. 2005); <u>United States v. Hung</u>, 459 F.3d 1180 (11th Cir. 2006). Mr. McCabe respectfully asks this Court to consider the case law and principles pronounced by the United States Supreme Court when evaluating his ultimate guideline range and sentence.

## IV - OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Part A – The Offense – Paragraph 7 – Prior to the Mr. McCabe's plea in this matter, Undersigned represented him before the Florida Bar/Florida Supreme Court regarding his Florida law license. Mr. McCabe voluntarily consented to disbarment in Florida Supreme Court Case Numbers SC13-549 and SC13-636.

Part A – The Offense – Paragraphs 13, 19 & 25 – Mr. McCabe objects wherein the PSI states – "The total loss in this case is $7.1 million to at least 73 victims". Mr. McCabe objects to losses over $7 million and number of victims over 50. Defendant admits his criminal responsibility, but argues that the loss is between $2.5M-$7M, and the number of victims is less than 50. The reduction in the number of victims is attributable to the repayment of monies as well as providing legitimate legal services.
A two level reduction is appropriate for less than 50 victims. The overstatement of losses created a loss range of over $7,000,000 (2B1.1 (b)(1)(K)) which added an additional two (2) level increase in the loss table and increased the Offense Level Computation by two (2) levels. An example of overstatement is the following: PSI Property Holdings LLC claimed a loss of $1,000,000 ($7,003.10 and $982,500) when in fact PSI Property received $3,563,350.82 in total deposits in a closing statement dated 12-28-12 which encompasses the alleged loss of $982,500 + .  On this issue alone, the loss amount should be decreased by 2 levels from the loss table and guideline application.

The Court should consider <u>Credits Against Loss</u>, 2B1.13(E).  The Application Notes of 2B1.1 states - Loss shall be reduced by the following:

–9–

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

Mr. McCabe, during the commission of the offense did reimburse victims either through interest payments, direct payments or services performed. As is common among victims who have received correspondence from the U.S. Attorney's Office and/or the U.S. Probation Office requesting the amount of loss from an offense, forms returned would at times report more than the actual loss - for obvious reasons. Thus a reduction below $7 million and less than 50 victims is appropriate.

Part A – Offense Level Computation – Paragraph 27 – Mr. McCabe objects to a two level increase in the guideline computation for sophisticated means 2B1.1(b)(10)(C). Although a substantial loss has been had in this case, sophisticated means is not part of the offense conduct. Mr. McCabe, inter alia, received monies from financial institutions to close real estate transactions, and lied to the financial institutions which resulted in refinanced mortgages not being satisfied. Mr. McCabe obtained monies from victims/investors and purported to invest same in real estate/businesses, thus creating a positive return. Mr. McCabe did not invest the monies, but instead took funds from newer victims to pay previous victims. As well, Mr. McCabe used the funds to pay employees' salaries, business overhead, real estate and business loans. This conduct by no means involves sophistication.

Mr. McCabe's conduct does not allude to any intricate conspiracies involving

other entities or any actions on his part indicating a sophisticated offense.  Under 2B1.1 Application Note 8(B), Sophisticated Means Enhancement is described as follows: Sophisticated means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.  The sophisticated means enhancement may be applied if a defendant employed such means either in committing the offense or in evading detection.  Some courts have upheld the sophisticated means enhancement where a defendant committed an elaborate mail fraud and used complex tactics to cover it up <u>U.S. v. Anderson</u>, 349 F.3d 568 (8th Cir 2003); where a defendant and his wife defrauded fourteen insurers and the Social Security Administration by simulating a serious head injury for a sustained period <u>U.S. v. Rettenberger</u>, 344 F.3d 702(7th Cir. 2003); where a defendant committed identity thefts against a number of victims by exploiting different vulnerabilities to different banking, credit, and purchasing systems in  a coordinated way <u>U.S. v. Jackson</u>, 346 F.3d 22 (2nd Cir. 2003).  Although Mr. McCabe committed bank fraud and offered fictitious real estate investments, there is nothing sophisticated about the crimes. There were no fictitious entities, corporate shells, offshore accounts or other sophisticated means used to implement the crimes. This enhancement in the PSI is

–11–

contrary to the written plea contract where the parties agreed that this enhancement should not be included in the guideline calculations. It is respectfully recommended that this enhancement be deleted from the report.

Part A – Offense Level Computation – Paragraph 30 – The plea agreement did not include any increase for an aggravated role adjustment, and same should not be applied. The government, in the plea, specifically agreed to not seek an aggravated role adjustment.

Part C – Offender Characteristics – Paragraphs 49 & 50 – Based upon Mr. McCabe's substance abuse and amenability to treatment, he requests the Court recommend placement in the 500 hour Bureau of Prisons Residential Drug Abuse Program (RDAP).

## V - REQUEST FOR VARIANCE BELOW THE APPLICABLE GUIDELINE RANGE

### (a) Family Ties and Responsibilities

Mr. McCabe has an extremely close and loving relationship with his entire family, including his wife and three daughters. Any excessive term of incarceration will undoubtedly affect his relationship with all his loving family members. Mr. McCabe is asking for the opportunity to be with his family in a timely fashion and prays the Court show leniency in this regard. Mrs. McCabe's sudden and unforeseen responsibilities, singularly brought on by Mr. McCabe's criminal conduct, include taking care of her three children alone and tending to the needs and wants of her father-in-law. Mrs. McCabe's new, everyday life has become an understandably spiritual difficulty and is a terrible emotional burden.

Mr. McCabe's father, Robert, is 81 years of age and is a former fire fighter from New Jersey. His father has been in Florida for 23 years and had major heart issues 20 years ago which required angioplasty at the University of Pennsylvania. Prior to Mr. McCabe's incarceration, he visited and cared for his father 5 days per week - doing his father's shopping, taking his father to doctor visits, religious services, and anywhere else necessary. Mr. McCabe's father is wheelchair bound after a spinal fusion operation, has severe arthritis in the spine and hips, macular degeneration and is nearly blind in one eye. His primary physician is Dr. Khambati and his cardiologist is Dr. Lakow; both doctors are affiliated with JFK Hospital. Mr. McCabe prays the Court impose a sentence that allows him the opportunity to provide his family with support and love before his father passes and his girls become women.

In Gall v. U.S. 128 S. Ct. 586 (2007), the court found that "compelling family circumstances" justify a downward variance from the guidelines.  The Seventh Circuit has held that the district court is required to consider a defendant's family circumstances and to provide an adequate analysis of how much weight, if any, they should command, U.S. v. Schroeder,536 F.3d 746 (7th Cir. 2008).  The Ninth Circuit found that family ties may warrant a non-guideline sentence even if they do not support a departure, U.S. v. Menyweather, 447 F.3d 625 (9th Cir. 2006) (affirming a departure for family ties but noting that even if the court erred in departing, Booker now permits the court to consider family ties and responsibilities as part of the "history and characteristics" of the defendant under 18 U.S.C. 3553 (a)(1); U.S. v.

–13–

Antonakopoulos, 399 F.3d 68, 81 (1st. Cir. 2005) (in bank fraud case, on remand district court may consider fact that defendant was caretaker for his brain damaged son as grounds for sentence below range even though there were alternative means of care so defendant apparently did qualify for traditional departure) U.S. v. Galante, 11 F.3d 1029 (2d Cir. 1997) (affirms district court's 13 level downward departure in drug case from 46-57 months to 8 days where defendant showed he was a conscientious and caring father of two young sons who would have faced financial hardships). Other courts including the 6th Circuit, 8th Circuit and the 10th Circuit have permitted downward variances based on family ties/responsibilities. Mr. McCabe prays the Court takes into consideration his very important role as a son/husband/father and departs from the applicable guideline range.

### (b) Employment History

Since the advent of Booker, the Court may consider almost any facet of an individual's background, including Employment History, as a consideration for a downward variance. After graduating from Rutgers University in 1983, Mr. McCabe began his profession as an attorney. He was admitted to the Florida Bar in 1990, and practiced in Florida since 1994, when he moved to Palm Beach County. Mr. McCabe practiced real estate law focusing on title work and foreclosures. He founded Timothy McCabe, PA; McCabe and Samiljan, LLC; and City Title. These firms were formed with the intent of providing honest and legal representation for real estate transactions, title work

and foreclosures. For the better part of 23 years, Mr. McCabe was a competent and honest attorney providing assistance to the people of Palm Beach County.  Unfortunately, after financial setbacks, he made the criminal decision of draining funds in order to continue operating his businesses and paying others who were due investment monies.  The Court is urged to consider his lengthy period of employment without problems when imposing sentence.  The following circuits have found an excellent work record a reason to depart below the applicable guideline range: U.S. v. Jones, 158F.3d 492 (10th Cir. 1992) (in departing downward three levels, the court considered "the defendant's long impressive work history…where good jobs are scarce) U.S. v. Big Crow, 898 F.2d 1326, 1331-32 (8th Cir. 1990) (excellent employment record); U.S. v. Jagmohan, 909 F.2d 61 (2d Cir. 1990) (exceptional employment record); U.S. v. Higgins, 967 F.2d 841 (3d Cir. 1992) (young age and stable employment will justify a downward departure  if "extraordinary".)

## VI  - USSC SOURCEBOOK FISCAL YEAR 2012 (FY2012) FRAUD VIOLATIONS AND THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

The United States Sentencing Commission's Sourcebook of Federal Statistics provides sentencing information on 82,674 felony and Class A misdemeanors for a myriad of offenses sentenced under the Sentencing Reform Act by the district courts between October 1, 2011 and September 30, 2012. During this time period, 8,237 (10.5% of all Federal offenses committed) defendants were sentenced for fraud violations, Table 27A. The statistics do not differentiate between the types of fraud or offense

characteristics. The Mean length of imprisonment in this offense category with a Criminal History I was 24 months, Table 13. Of the 8,237 offenders, 4,154 were sentenced within the guideline range, 958 or 23.8% received non-government sponsored below range sentences, and 1 via Booker/3553 variances, Table 27A.

The Guideline sentencing range in months reveals that in the 151 to 188 range, 1,475 offenders were sentenced for all offenses, which is 2% of all offenders, Table 23. Mr. McCabe's PSI range is 151-188 months. For offenders in each level category, 1151 had an Offense Level of 34 which is 1.5% of all offenders. Of the 1151 offenders, only 350 had a criminal history of I, Table 21. The remainder had a history of II to VI with 616, or more than half, having a history of VI. Mr. McCabe is nowhere near this category. Although not specified, the magnitude of ranges in months and offense levels normally would indicate very serious and often violent crimes against the public by offenders with a lengthy criminal history category.

The primary reasons given by the sentencing courts for downward departures in guideline range include: Criminal History Issues 31.6%; General Mitigating Circumstances (5K2.0) 14.7%; Family Ties and Responsibilities (5H1.6) 7%; Physical Condition (5H1.40) 4.2%; Age (5H1.1) 3.3%; and Charitable works/good deeds (5H1.11), Table 25.

The primary reasons given by the sentencing courts for downward departures in all cases with BOOKER/18 U.S.C. 3553 include: Criminal History Issues 13%; Avoid Unwanted Disparities 7.3 %; Insufficient documentation to Determine Reason 4.6%;

Charitable good works/good deeds (5H1.11) 1.9%; and Age (5H1.1) 1.8%, Table 25A.

Reasons given by sentencing courts for sentences below the guideline range in all cases with BOOKER/18 U.S.C. 3553 included: Circumstance of Offense and History of Defendant 21.8%; Reflect seriousness of Offense and Respect for Law 14%; Adequate Deterrence 11.2%; Protect Public From Future Crimes 6.8%; Avoid unwanted disparities 6.7%; and Criminal History Issues 5.2 %, Table 25B.

Downward departures from the guideline range and degree of decrease for each offender for Fraud violation cases involve 139 defendants, median sentence of 11 months, median decrease of 10 months, and median percent decrease from guideline range 51.9%, Table 31A.  The Court should note that the median sentence of 11 months is after departure consideration, and Mr. McCabe's PSI prison range is 151-188 months.

Downward departures with BOOKER/18 U.S.C. 3553 and degree of decrease in Fraud cases: 117 defendants, median sentence in months 15, median decrease in months from guideline range 13, and median percent decrease in months 48.6%, Table 31B.

Below guideline range with BOOKER/18 U.S.C. 3553 and degree of decrease in Fraud cases: 1552 defendants, median sentence in months 12 , median decrease in months from guideline range 12, and median percent of decrease 55.4%, Table 31C.

All remaining below guideline range cases and degree of decrease in Fraud cases: defendants 74, median sentence in months 0, median decrease in months 6, and median percent decrease 100%, Table 31D.

In the 11th Circuit, Non-Government Sponsored Below Range in all cases with

BOOKER/18U.S.C.3553 involved 12,015 cases and 19% received reductions below the guidelines, Table N11. Within the Southern District of Florida, 2,122 defendants were sentenced for all offenses and 424 were sentenced below the guideline range via BOOKER/18U.S.C.3553.  This is a 20% reduction from the applicable guideline range. The mean sentence for fraud offenses was 35 months. As the Court will note, the average reduction below the guideline range in Fraud cases nationally is 50% or greater.

Based on the aforementioned data and Mr. McCabe's Guideline Imprisonment Range, The Court is requested to consider 18 U.S.C. 3553 (a) (6) which involves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" Gall, 552 U.S. at 50, 128 S.Ct.586; and Rita v. United States, 551 U.S. 338,356,127 S.Ct. 2456, 168 L.Ed.2d. 293 (2007).

Attached to this Pleading, and incorporated herein, please find the following:

A.	LETTERS (92 pages);

B.	OFFENDER GRAPH - PRIMARY OFFENSE CATEGORY 2012 (1 page); &

C.	2012 GUIDLEINE SENTENCES, SOUTHERN DISTRICT FLA (15 pages).

### VII - CONCLUSION

Mr. McCabe asks the Court to consider him holistically. Mr. McCabe can serve his incarceration and exit the Bureau of Prisons a productive member of society while on supervised release and thereafter. Mr. McCabe can be an asset to his children and family upon his release. Mr. McCabe has the necessary support system and tools to give

the Court confidence that he will keep his promise to maintain a crime free life. Mr. McCabe is not a risk of reoffending.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic filing on March 10, 2014.

                                          ROBERT S. GERSHMAN, ESQUIRE
                                        GERSHMAN & GERSHMAN, P.A.
                                        2160 W. Atlantic Avenue, Second Floor
                                        Delray Beach, Florida 33445
                                        (561) 684-8898 (telephone)
                                        (561) 998-5868 (facsimile)
                                        robert@rglawfirm.us
                                        <u>s/Robert S. Gershman</u>
                                        ROBERT S. GERSHMAN
                                        Florida Bar No. 917397